IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| KATHLEEN F. GODDARD, | Chapter 7 |
| --- | --- |
| | Case No. 08-04414-SSC |
| | Adversary No. 08-ap-00504 |
| Debtor. | (Not for Publication- Electronic Docketing ONLY) |
| DONALD B. STERNER, | MEMORANDUM DECISION |
| Plaintiff, | |
| vs. | |
| KATHLEEN GODDARD, | |
| Defendant. | |

## I. INTRODUCTION

On July 28, 2008, Donald Sterner, Plaintiff, filed this adversary proceeding seeking to have an obligation in the principal amount of $126,669.41 declared nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A). The Defendant, Kathleen Goddard, the Debtor in this Chapter 7 proceeding, filed an answer denying the allegations. Further pre-trial proceedings were conducted in this matter, and a trial was held on February 18, 2009. Thereafter this matter was deemed under advisement.

1

In this Memorandum Decision, the Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§1334 and 157.[1] (West 2008).

## II. FACTUAL BACKGROUND

The Debtor filed her Chapter 7 petition on April 21, 2008, and has recently remarried. In the fall of 2003, the Plaintiff and the Debtor were close personal friends.[2] At the time, both parties were single.[3] The Plaintiff had graduated from the University of Georgia and had worked at a lumber business in New Jersey that had been started by his great grandfather. However, after his father died, it appears that he and his brother sold the lumber business, and he commenced sharing some type of a revenue stream with his brother.[4] He testified that in the fall of 2003, he received about $700 every two weeks as revenue. Although he had met the Debtor in 2002 when she was a bartender in New Jersey, it was not until she suffered serious medical complications in 2003 that he became close personal friends with the Debtor.

In February 2003, the Debtor decided that she needed to move to the warmth of Arizona because of her on-going medical problems. She approached the Plaintiff at that time,

---

**1.** The Debtor filed her bankruptcy case on April 21, 2008. Hence, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ( "BAPCPA")(Pub.L.No. 109-8, §1501(b)(1), 119 Stat. 23, 216 cite) applies to these proceedings.

**2.** Joint Pre-trial Statement, Docket Entry No.17, Paragraph IIC.

**3.** The Plaintiff had been married, but was divorced in 1988.

**4.** The Plaintiff was not very specific as to the nature of his income. It appears that after his father died, some type of transfer of the lumber business occurred which allowed the Plaintiff and his brother to receive lease or similar payments. For purposes of this decision, that is sufficient information.

2

seeking money from him to move to Arizona to be near her daughter, Amanda Wolfe.[5] The Plaintiff testified that he purchased a Jeep Cherokee for her and provided her with money to move.[6] The Plaintiff acknowledged that he gave that money to the Debtor out of friendship and executed no document formalizing what he had done.

        The Plaintiff testified that he next recalled receiving a rather frantic telephone call in the fall of 2003, wherein the Debtor outlined that her daughter's residence in Mesa, Arizona was in foreclosure, that the Debtor had learned of the situation only recently, and the Debtor expressed regret that the house was being lost, since she had hoped to live in that house with her daughter. The Debtor represented to the Plaintiff that she was still having medical issues; hence, the Debtor's concern that her daughter was losing a potential place for the Debtor to live. It is clear that even the Debtor realized that she had placed a great deal of pressure on the Plaintiff concerning the foreclosure of her daughter's house.[7]

        In a November 3, 2003 email to the Plaintiff, the Debtor represented that her daughter, Amanda, was behind $6,000 in her mortgage payments. She also represented that the house had a mortgage obligation of approximately $135,000. She stated that her daughter intended to have a purchase contract forwarded to the Plaintiff which would allow the Plaintiff to purchase her daughter Amanda's house.[8] The Plaintiff testified that the email concerned the daughter's house, located at 11432 East Persimmon Avenue, Mesa, Arizona. In November 2003, the Plaintiff had not determined whether he should purchase Amanda's home, but he decided to consult with a lawyer to ascertain what steps he could take to assist the Debtor. However, almost immediately after the initial email from the Debtor, the Plaintiff received, on

---

    **5.** Exhibit 1.

    **6.** He estimated that he provided her with about $3,800 for the Jeep purchase, and between $800 to $1,000 to move.

    **7.** Exhibit 2.

    **8.** Id.

3

Sunday, November 9, 2003, an email from Amanda, the Debtor's daughter.[9] In the email, Amanda mentioned that she was having difficulty obtaining the information that the Plaintiff's attorney and accountant needed. She argued that her difficulty stemmed from the fact that her home was in foreclosure. In her email, Amanda outlined her belief that her residence had a fair market value of $135,000, that there was a first and second lien against the property, that the "total loan amount" was $119,000, and that there were closing costs, such as $3,000 as a prepayment penalty on one of the mortgages, and "realtor's fees."[10] She also described in detail how the transfer of real property in Arizona differed from that in New Jersey. At one point, she stated

> "Arizona real estate sales work a bit differently than New Jersey real estate sales; they are much less complicated. We do not have round tables and all kinds of people that have to come together. . .We simply have a standard contract (I can fax this to you whenever you're ready) and we use a title company that acts as a mediator and does all the leg work in coordinating with you (or your attorney and accountant if you prefer). They handle getting the loan payoffs, making sure title is clear, making sure the seller pays all necessary obligations, etc. and then after they draw up the documents, we sign and they record it [sic]. Very simple. With a cash offer it simplifies the process even more so. We are not waiting on financing from lenders, so really they just need a week from when we give them the contract to do the paperwork and contracts, etc. There is no time involvement for you at all, just signing the papers, that's it."[11]

She concluded by requesting that the Plaintiff provide a fax number, so that she could fax the contract to him. She noted that she was unable to open escrow until she received a signed contract from him.[12] However, the Plaintiff testified that Amanda never faxed a contract to him.

It is important to review Amanda's representations in the context of her experience. Both the Debtor and the Plaintiff testified at trial that Amanda knew the Arizona

---

**9.** Exhibit 3.

**10.** Id.

**11.** Id. at para. 5.

**12.** Id. at para.7.

4

real estate business quite well. As an Arizona real estate agent, she was familiar with how to sell and purchase homes in the State and the procedures necessary to close escrow and transfer title in such transactions.

Still believing that the foreclosure of Amanda's home was imminent, the Plaintiff testified that he approached Mr. Jim Vicarro, a banker at a local community bank who was a personal friend of his brothers, to obtain some type of loan to assist the Debtor. Amanda soon had direct contact with Mr. Vicarro as to the amount due and owing on the first and second mortgage loans on her Mesa residence.[13] In the email to Mr. Vicarro, Amanda mentioned that she had a first loan in the amount of $101,000 and that there was a second loan with Litton Loan Servicing, but she was unsure of the amount.[14] On December 11, 2003, the Trust Deed Service Company, presumably the trustee under the deed of trust with Litton on Amanda's residence, notified Mr. Vicarro that the payoff to prevent the foreclosure of the Litton loan on Amanda's home was $104,746.12, which included interest payments on the loan from May 1, 2003 through December 16, 2003, a prepayment penalty on the loan of $3,032.26, and foreclosure fees and costs of $1,687.75.[15] The payoff letter to Mr. Vicarro noted that the trustee's sale of Amanda's residence was scheduled for December 17, 2003.[16]

Believing that the foreclosure sale was imminent, the Plaintiff transferred $104,746.12 from Monmouth Community Bank, N.A., the bank at which Mr. Vicarro worked, to the Trust Deed Service Company, who had provided the payoff balance on the Litton loan to Mr. Vicarro.[17] The Plaintiff testified that he did not have sufficient funds in his accounts to make

---

**13.** Exhibit 5.

**14.** Id.

**15.** Exhibit 4.

**16.** Id. at last sentence in the penultimate paragraph.

**17.** Exhibit 8; also see Exhibit 4.

5

that type of transfer.  Ultimately he had to obtain an equity loan on his home in New Jersey to make the required transfer to Litton.  The Plaintiff still believed that he would obtain some type of lien on Amanda's residence for his repayment of the Litton loan.

On December 31, 2003, the Plaintiff received an unusual email from the Debtor.  It stated that the second lien, the Litton loan, had not been paid off in full.  She noted that "a mortgage" was behind $1,600, that the homeowners' association was owed $503, and the taxes for the last half 2002, for all of 2003, and the first half of 2004 were due and owing or past due.[18]  She proposed a number of alternatives to the Plaintiff: "payoff the 2nd mortgage and pay the taxes and homeowners association–$29,461.68; catch up 2nd and pay taxes and Homeowners Association–$2,869.64; sell the house and pay [the Plaintiff]. . .if the house doesn't sell just pay [the Plaintiff] anyway."[19]  The Debtor then stated that she thought the funding from the Plaintiff would pay off the loans in full and that apparently that had not happened.  She noted that the taxes and the homeowners' association had not been paid.  She then referred to the fact that if Amanda's name remained on the deed for the Persimmon property, "the bankruptcy court [would] take it."  She noted that the second mortgage had not been paid off and that she could not get the first mortgage "in her name" until the second mortgage had been paid off.[20]

The Court concludes that this December 31, 2003 email from the Debtor was simply seeking more money from the Debtor as a part of a scheme or artifice to defraud.  First, it is clear that the Litton loan, as of December 16, 2003, had been paid in full through the transfer by Mr. Vicarro, on behalf of the Plaintiff, to the trustee acting on behalf of Litton.  Perhaps it was the first loan that had been paid off, with a second loan, also to Litton, still remaining on Amanda's residence.  Nevertheless, the Debtor had received substantial funding from the Plaintiff to pay off at least one of the Litton loans.  The Debtor should have, at that point, simply

---

**18.**  Exhibit 6.

**19.**  Id. at the middle of the page.

**20.**  Id. at the bottom of page 1 and the top of page 2.

6

prepared, or asked someone to assist her to prepare, a promissory note and deed of trust to allow the Plaintiff to obtain a lien on Amanda's residence. This she did not do. Nor did Amanda, who because of her real estate experience knew that at least one of the liens of Litton had been paid in full, assist or prepare any documentation to provide the Plaintiff with some type of lien on her house.[21] Moreover, there is no credible evidence in the record that the Debtor or Amanda ever intended to accept the funding from the Plaintiff as some type of gift.[22] Indeed the record is replete with emails from both the Debtor and Amanda which repeatedly offered the Plaintiff title to Amanda's residence or at least some type of lien position on Amanda's home.

Moreover, the Debtor continued with her pattern of obtaining funding from the Plaintiff with no intention to repay it. On January 2, 2004, once again believing that the Debtor required additional funding to payoff the second lien, taxes, and the homeowners' association on Amanda's residence, the Plaintiff provided another $26,923.29, by cashier's check, to Litton Loan Servicing, LP.[23] On January 21, 2004, a deed transferring title to the Persimmon Avenue property, the residence owned by Amanda, was transferred from Amanda to the Debtor.[24] The Plaintiff conceded that he was aware of this transfer. However, the Debtor told the Plaintiff that there were sink holes in the area which had severely impacted the value of Amanda's house. He was also aware that Amanda had also apparently found the Debtor a condominium in the area.

---

**21.** It is unclear to the Court why Amanda, the Debtor's daughter, who was so involved with Mr. Vicarro in obtaining the payoff information for the Litton loan, and who facilitated the contact between Mr. Vicarro and Litton to effectuate the payoff, suddenly stopped communicating with the Plaintiff and/or Mr. Vicarro.

**22.** There are the self-serving statements of the Debtor, which the Court concludes are not credible. The Debtor's mother also made certain ambiguous statements as to a gift from the Plaintiff to the Debtor. However, there is no credible evidence to support the mother's vague statements of a gift, given the numerous emails from the Debtor and Amanda which stated that something other than a gift was contemplated as a result of the Plaintiff's providing roughly $131,000 in funding to save Amanda's residence from a foreclosure sale.

**23.** Exhibit 9.

**24.** Joint Pretrial Statement, Docket Entry No. 17, Paragraph IIK; also see Exhibit 10.

7

Neither the Debtor nor Amanda provided the Plaintiff with any loan documentation to secure the initial or additional advance from the Plaintiff to the Debtor on either Amanda's house, now owned by the Debtor, or on the condominium that Amanda had allegedly purchased for the Debtor. There is no credible evidence in the record that the Debtor or Amanda intended the additional funding by the Plaintiff to be a gift.

      On October 27, 2004, the Debtor sold the Persimmon Avenue residence, and the deed was recorded on November 1, 2004.[25] The Debtor provided no disclosures concerning the sale of the Persimmon Avenue residence in Mesa, Arizona, which reflected that there were any sink holes in the area that had dramatically impacted the value of the residence. Because the sale of the Persimmon Avenue residence occurred within a relatively short period of time after the Debtor received title to the property, the Court questions the motive of the Debtor. The Court concludes that there was no credible evidence presented to support the Debtor's assertion to the Plaintiff that there were sink holes on the property; rather, the transfer from the Debtor to the third party, without any payment to the Plaintiff, reflected an artifice or scheme to defraud the Plaintiff.

      In October 2004, the Debtor acquired a condominium on East Brown Road. Once again the Plaintiff hoped to obtain some type of lien on the new property. However, as a part of the Debtor's scheme or artifice to defraud, the Debtor never provided a lien on the condominium to the Plaintiff.

      On August 16, 2005, the Debtor paid the Plaintiff the sum of $5,000.[26] The Court concludes that the payment was made because a contentious telephone conversation had resulted between the Debtor and the Plaintiff. The Plaintiff had notified the Debtor that he had contacted a lawyer to assist him in having the Debtor's Arizona condominium transferred to his name, so that he could avoid the increase in expenses that he was incurring on the equity loan that he had

---

**25.** Joint Pretrial Statement, Docket Entry No. 17, Paragraph IIL; also see Exhibit 11.

**26.** Exhibit 15.

placed on his New Jersey residence.[27] After the aforesaid payment, there were no further payments made by the Debtor, and the Debtor apparently refused to transfer title of her condominium to the Plaintiff or make any other accommodations to repay the Plaintiff.

Aside from her allegation that all of the funds transferred by the Plaintiff to the Debtor were gifts, the Debtor presents another argument as to why she need not repay the Plaintiff. She states that she never promised to repay the Plaintiff through a transfer of her property or by providing him with a promissory note and deed of trust on any residence that she might own. Rather, she argues that the Plaintiff understood that she had a medical malpractice claim as a result of the serious injuries that she incurred in 2003 and that she intended to repay the Plaintiff only when, and if, she recovered on her malpractice claim. The Plaintiff has repeatedly denied any such agreement with the Debtor.

It does appear that around June 11, 2002, the Debtor requested the law firm of Hanna and Anderson, attorneys at law located in Wall, New Jersey, to represent her with respect to an alleged medical malpractice claim that occurred in New Jersey.[28] However, the Debtor and the law firm were subsequently unable to retain a medical doctor who would provide an opinion that the New Jersey doctor had committed medical malpractice concerning the Debtor's injuries. Thus, around July 14, 2003, Hanna and Anderson agreed to file a pro se complaint on the Debtor's behalf in New Jersey, but would provide no further services to her.[29] The Debtor continued to prosecute the action in New Jersey on her own. Ultimately the New Jersey Courts believed that her action had no merit, and her medical malpractice action against the New Jersey doctor was dismissed with prejudice on June 25, 2004.[30]

---

**27.** Exhibit 16.

**28.** Exhibit A.

**29.** Exhibit 19.

**30.** Exhibit E.

9

This Court concludes that by July 14, 2003, the Debtor was aware that her medical malpractice claim had serious deficiencies, since her counsel only agreed to file a pro se complaint for her and provide no further services. Thus, although the Debtor still had a claim, it certainly could not be classified as meritorious. The medical malpractice claim had a speculative nature to it, with the Debtor required to obtain some type of medical opinion that malpractice had occurred before she could proceed with her complaint under New Jersey law. The Debtor was never able to obtain such a medical opinion, and the New Jersey court dismissed her medical malpractice claim against the doctor with prejudice. However, given the Debtor's knowledge that her attorneys were no longer representing her with respect to the medical malpractice claim, it is inconceivable that the Plaintiff would agree to await her recovery from the medical malpractice claim as a precondition to being repaid on the funding that he was providing to the Debtor in the fall of 2003 and beyond to save Amanda's home from foreclosure.

Even if the Plaintiff agreed to such a contingency concerning the repayment of his loans to the Debtor, because the medical malpractice claim had no merit, the Court concludes that the Debtor's representation of having a meritorious medical malpractice claim was false and the Debtor knew, at the time of the representation, that it was false. Given the facts of this case, the Debtor would have made such a representation with the intent of deceiving the Plaintiff to obtain more funding from him which she had no intention of repaying.

Every document presented at the trial reflects that the Debtor and Amanda repeatedly promised the Plaintiff title to Amanda's residence or some type of security for the repayment of his obligation. The Debtor repeatedly requested money from the Plaintiff, setting up very short time frames to respond and always referring to the imminent foreclosure of Amanda's residence where the Debtor presumably resided. The Court concludes that the Debtor repeatedly manipulated the Plaintiff and provided the Plaintiff with information that was false, taking advantage of the fact that they were close friends at the time, to set up a scheme or artifice to defraud the Plaintiff out of a substantial sum of money.

10

On April 9, 2008, the Plaintiff obtained a default judgment against the Debtor, in the principal amount of $126,669.37, which was entered in the Maricopa County Superior Court.[31]

III. DISCUSSION

Pursuant to 11 U.S.C. § 523(a)(2)(A), a monetary debt is nondischargeable "to the extent obtained by false pretenses, a false representation, or actual fraud." In the Ninth Circuit, to prove nondischargeablity under §523(a)(2)(A), the Plaintiff needs to show "(1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations." In re Sabban, 384 B.R. 1 (9th Cir. BAP 2008); In re Diamond, 285 F.3d 822 (9th Cir. 2002); In re Slyman, 234 F.3d 1081 (9th Cir. 2000); In re Ettell, 188 F.3d 1141, 1144 (9th Cir. 1999); In re Hashemi, 104 F.3d 1122, 1125 (9th Cir. 1996); In re Eashai, 87 F.3d 1082 (9th Cir. 1996).

The Plaintiff must establish the nondischargeability of a debt by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 284, 111 S.Ct. 654, 657-58, 112 L.Ed.2d 755 (1991). In this case, the Plaintiff has established all of the elements of § 523(a)(2)(A).

A. False Representations and the Debtor's Knowledge Thereof

In this case, the Debtor induced the Plaintiff to loan her a substantial amount of money to preclude the foreclosure of her daughter's house, located at 11432 East Persimmon Avenue in Mesa, Arizona, with the Plaintiff to obtain title to the daughter's residence, or a lien thereon, as a mechanism to repay the Debtor's obligation to the Plaintiff. The Debtor knew at the time that she requested the funding that she was making a false representation to the Plaintiff

---

**31.** Exhibit 18, Default Judgment attached thereto. The Plaintiff also requested the principal amount of $126,669.37 in the Joint Pretrial Statement. See Docket Entry No. 17, Paragraph I, Line 23.

11

to induce him to provide the money to her.  The communications between the parties, including the Debtor's daughter, clearly show that the Debtor and her daughter contemplated the Plaintiff's receiving some form of security for his loan, with the Debtor eventually repaying the obligation, be it through a sale of Amanda's home, or later, with her recovery on an anticipated medical malpractice claim, or through other means.[32]  The evidence presented at the trial reflects that the Plaintiff was repeatedly promised title to Amanda's property or some type of security for the repayment of the obligation.  Moreover by July 2003, the Debtor was aware that her medical malpractice claim was without merit and likely to come to naught.  Therefore, her argument that the Plaintiff had agreed to be repaid, when, and only if, she succeeded with her malpractice claim is not credible.  In essence, given her knowledge that the claim was not meritorious, at least from her attorneys' standpoint, if she promised the Plaintiff a contingent repayment based upon her recovery, she knew at the time that she extracted such a commitment from the Plaintiff, that such a request by her was a separate representation by her, which she knew at the time was false, and which could only have been made with the intent by the Debtor to defraud the Plaintiff.  Thus, the Plaintiff has proven, by a preponderance of the evidence, factors 1 and 2 under Ninth Circuit law.

### B. Intent to Deceive

For a debt to be excepted from discharge, the debtor must also actually intend to defraud the creditor.  In re Tsurukawa, 258 B.R. 192 (9th Cir. BAP 2001).  However, direct evidence of an intent to deceive is rarely shown.  Hence, intent may be "inferred and established from the surrounding circumstances."  In re Hultquist, 101 B.R. 180 (9th Cir. BAP 1989); In re Anastas, 94 F.3d 1280 (9th Cir. 1996); In re Dakota, 284 B.R. 711 (Bankr.N.D.Cal. 2002).  The Court should consider the debtor's conduct at the time of the representations and may consider subsequent conduct to the extent that it provides an insight into the debtor's state of mind at the time of the representations.  In re Zack, 99 B.R. 717 (Bankr. E.D. Va. 1989); In re Basham, 106

---

**32.** See Exhibit No. 5.

B.R. 453, 457 (Bankr.E.D.Va.1989). Because no single objective factor is dispositive, assessment of intent is, thus, left to the fact-finder. In re Jacks, 266 B.R. 728 (9th Cir. BAP 2001). The intent to defraud a creditor is a finding of fact. In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989).

Given the repeated manipulative communications by the Debtor, constantly requesting funds and "immediate" assistance from the Plaintiff, the fabricated construction of "sink holes" that decreased the value of Amanda's property, and the subsequent sale of the property to another party within a relatively short period of time after the Debtor received title to Amanda's property, this Court concludes that the Debtor made false representations to the Plaintiff, with the intent to deceive the Plaintiff. As noted previously, if the Debtor did coerce the Plaintiff to accept a contingent repayment of his loan from her medical malpractice claim, she did so based upon a separate false representation to the Plaintiff which she knew, at the time it was made, to be false, again with the intent to deceive the Plaintiff. The Debtor wove a pattern of deceit that may only be attributed to her intent to deceive the Plaintiff. As a result, the Plaintiff has proven factor 3.

### C. Justifiable Reliance

The Court also concludes that the Plaintiff has established the fourth element, justifiable reliance. The Supreme Court has held that a creditor's reliance on a debtor's misrepresentation or omission need be only justifiable, not reasonable, to except a debt from discharge under § 523(a)(2)(A). Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 439, 133 L.Ed.2d 351 (1995). Prior to the Supreme Court's decision in Field v. Mans, the Ninth Circuit repeatedly held that creditors must prove "justifiable reliance" in exception to discharge cases. In re Kirsh, 973 F.2d 1454, 1458-1460 (9th Cir.1992); In re Apte, 180 B.R. 223 (9th Cir. BAP 1995). In the decision of In re Apte,, the Bankruptcy Appellate Panel explained the meaning of justifiable reliance:

> The general rule is that a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation. In other

13

> words, negligence in failing to discover an intentional misrepresentation is no defense. However, a person cannot rely on a representation if he knows that it is false or its falsity is obvious to him. In sum, although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth.

Id. at 229 (internal citations and quotations omitted).

In considering whether the reliance is justifiable, the court must take into account "the knowledge and relationship of the parties." In re Kirsh, 973 F.2d at 1458. Here, the parties were close personal friends. They were in constant communication, or the Debtor requested funding on an emergency basis for herself or her daughter, Amanda. The nature of the relationship was such that the Debtor had no qualms about repeatedly seeking the financial assistance of the Plaintiff. When the Debtor decided to move to Arizona, she turned to the Plaintiff for assistance. The Plaintiff acknowledged giving the Debtor almost $4,000 to purchase a vehicle and for moving expenses. The Plaintiff testified that this was done out of friendship. When the Debtor again asked the Plaintiff for assistance to prevent her daughter's home from being lost to foreclosure, the Plaintiff went so far as to get an equity loan on his home in New Jersey to assist the Debtor. Such was the nature of the parties' relationship.

As further evidence of the Plaintiff's justifiable reliance on the Debtor's false representations, the Plaintiff was advised that the Debtor's daughter, Amanda, purportedly had real estate experience and would be able to prepare and provide the Plaintiff with title to, or a lien on, Amanda's property at some juncture. Thus, the Debtor wove a web of deceit based upon a close friendship and the expertise of her daughter in the real estate area to lure the Plaintiff into providing various loans to the Debtor.[33] As a close personal friend of the Debtor, the Plaintiff had no reason to believe that the representations made by the Debtor were false. The convincing nature of the representations made by the Debtor is also evidenced by the bank in New Jersey providing funding, at Amanda's behest, to pay off the Litton loan and avoid a foreclosure of

---

**33.** The daughter's expertise is reflected in the emails that she sent to the Plaintiff and to the bank in New Jersey that paid off the Litton loan based upon the information supplied by the daughter.

14

Amanda's residence. Since the many requests for funding from the Debtor were frequently presented as genuine emergencies, the Plaintiff believed that he had to respond within a very short time-frame. In essence, the nature of the Debtor's scheme or artifice to defraud the Plaintiff was to create what appeared to be plausible emergencies which gave the Plaintiff little time to respond. Even after the Debtor sold the Persimmon residence and purchased a condominium, because of the close friendship between the parties, the Plaintiff continued to believe that the Debtor would repay him through some type of lien on the Debtor's new property. Based upon the foregoing, the Court concludes that the Plaintiff justifiably relied upon the Debtor's false representations.

### D. Loss and Damage which Proximately Resulted from the Representations

As a result of the Debtor's false representations, the Court concludes that the Plaintiff suffered a loss in the amount of $126,669.37, plus accrued interest and costs thereon. On April 9, 2008, the Plaintiff obtained a default judgment against the Debtor in the principal amount of $126,669.37, plus prejudgment interest thereon at the rate of ten percent per annum, for a total judgment of $179, 629.58. Interest continues to accrue on said judgment.

Federal courts "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the state in which the judgment was rendered." In re Nourbakhsh 67 F.3d 798, 800 (9th Cir. 1995) (citing Marrese v. Am. Academy of Orthopaedic Surgeons, 470 U.S. 373, 380, 105 S.Ct. 1327, 1331-32, 84 L.Ed.2d 274 (1985) and 28 U.S.C. § 1738, the Full Faith and Credit statute). This is especially true if there are no new issues presented. In re Comer, 723 F.2d 737 (9th Cir. 1984). In this case, the Debtor did not present any new facts or issues as to the validity of the default judgment, the principal amount of the obligations reflected in the judgment, the calculation of the prejudgment interest, or any other fact with respect to the judgment. Thus, the amount of the state court judgment can be given preclusive effect and serve as the basis of a nondischargeable judgment in this Court as to the loss incurred by the Plaintiff. Therefore, the Court concludes that the debt obligation owed to

15

the Plaintiff is in the principal amount of $126,669.37, plus interest thereon at the rate of ten percent per annum, and any costs incurred by the Plaintiff. As of April 9, 2008, the amount of the judgment, including prejudgment interest and costs thereon, was $179,629.58. However, because of the Debtor's failure to pay said judgment in full, interest continues to accrue on the judgment.

The evidence also reflects that the Plaintiff would never have provided the funding to the Debtor to save her daughter's residence from foreclosure but for the false representations of the Debtor and his justifiable reliance thereon. He advanced two loans for the benefit of the Debtor, within a relatively short period of time, based upon his close friendship with the Debtor. The Debtor represented that she would repay him by transferring title of her daughter's residence to him, placing a lien on the daughter's residence so that he could be repaid at the time of sale, or providing the Plaintiff with any recovery that she might receive from a medical malpractice claim which she knew to be without merit. Because the Debtor's daughter, who had experience in the real estate area, also confirmed that her home was about to be lost in foreclosure, the Plaintiff provided two loans, on an emergency basis. The fact that the loans were made ultimately for the benefit of the Debtor is reflected by the daughter's transfer of her residence to the Debtor shortly after the Plaintiff provided the funding as requested. The Court concludes that the Plaintiff would never have incurred the loss that he did but for the numerous false representations of the Debtor who manipulated the Plaintiff repeatedly based upon their close relationship. The Plaintiff has proven the final factor to have the debt deemed nondischargeable.

IV. CONCLUSION

Based upon the foregoing, the Court concludes that the Plaintiff has established all of the elements required to have the entire debt owed to him by the Debtor deemed

16

nondischargeable under §523(a)(2)(A). As of April 9, 2008, the Debtor owed the Plaintiff the amount of $179,629.58. However, interest has continued to accrue on said judgment, and the Debtor also owes the Plaintiff the costs of prosecuting this adversary proceeding in the Bankruptcy Court. The Plaintiff shall provide the Court with an appropriate judgment which reflects that amount due and owing to the Plaintiff as of the date the judgment is docketed in this Court. The Plaintiff shall settle said judgment in this Court on five days' notice to the Debtor. The Court shall execute a separate order incorporating this decision.

DATED this 8th day of June, 2009

*[signature]*

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

17